Approved: <u>Cecilia Vogel</u>
          CECILIA E. VOGEL/TARA M. LA MORTE
          Assistant United States Attorneys

20 MAG 2482                                                    ORIGINAL

Before:   THE HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge
          Southern District of New York

---

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED COMPLAINT** |
|     - v. - | Violations of 18 U.S.C. §§ 215, 1343, 1349, 1028A, 1956 |
| HERODE CHANCY, MICHAEL ALBARELLA, and ADEDAYO ILORI, | COUNTY OF OFFENSE: NEW YORK |
|     Defendants. | |

SOUTHERN DISTRICT OF NEW YORK, ss.:

    TERRY B. KIM, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
(Conspiracy to Commit Wire Fraud)

    1. From at least in or about March 2019 up to and including in or about March 2020, in the Southern District of New York and elsewhere, HERODE CHANCY and ADEDAYO ILORI, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

    2. It was a part and object of the conspiracy that HERODE CHANCY and ADEDAYO ILORI, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18,

United States Code, Section 1343, to wit, CHANCY and ILORI agreed together and with others to engage in a scheme in which they would submit fraudulent business loan applications with the intent not to repay the loans (the "Loan Scheme"), and in connection therewith and in furtherance thereof, would transmit and cause to be transmitted interstate electronic mail.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

3. From at least in or about March 2019 up to and including in or about March 2020, in the Southern District of New York and elsewhere, HERODE CHANCY and ADEDAYO ILORI, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, CHANCY and ILORI engaged in a scheme in which they submitted fraudulent business loan applications with the intent not to repay the loans, and in connection therewith and in furtherance thereof, transmitted and caused to be transmitted interstate electronic mail.

(Title 18, United States Code, Section 1343 and 2.)

## COUNT THREE
### (Aggravated Identity Theft)

4. Between in or about January 2020 and March 2020, in the Southern District of New York and elsewhere, HERODE CHANCY and ADEDAYO ILORI, the defendants, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, CHANCY and ILORI used the names and dates of birth of other persons when submitting, and causing the submission of, fraudulent loan applications made in furtherance of the fraudulent conspiracy and scheme charged in Counts One and Two, respectively.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

## COUNT FOUR
(Conspiracy to Commit Money Laundering)

5. From at least in or about February 2020, through in or about March 2020, in the Southern District of New York and elsewhere, HERODE CHANCY, MICHAEL ALBARELLA, and ADEDAYO ILORI, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to violate the money laundering laws of the United States.

6. It was a part and an object of the conspiracy that HERODE CHANCY, MICHAEL ALBARELLA, and ADEDAYO ILORI, the defendants, and others known and unknown, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, to wit, the purported proceeds of business loans obtained in violation of Title 18, United States Code, Section 1343, as charged in Count Two of this Complaint, would and did conduct and attempt to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, to wit, the defendants agreed to launder, through a bank account opened using a stolen identity, the purported proceeds of business loans obtained in violation of Title 18, United States Code, Section 1343, as charged in Count Two of this Complaint, by submitting business loan applications that contained fraudulent information, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Sections 1956(h).)

## COUNT FIVE
(Bank Bribery - Solicitation and Acceptance)

7. In or about February 2020, in the Southern District of New York and elsewhere, MICHAEL ALBARELLA, the defendant, being an officer, director, employee, and agent of a financial institution, would and did knowingly and corruptly solicit and demand for the benefit of a person, and corruptly accept and agree to accept things of value exceeding $1,000 from a person, intending to be influenced and rewarded in connection with any business and transaction of such institution, to wit, ALBARELLA, while acting as a manager of a financial institution located in New York, New York ("Bank-1"), and insured by the Federal Deposit Insurance Corporation ("FDIC"), solicited and accepted a bribe payment in connection with opening a fraudulent bank account at Bank-1 using

a stolen identity in furtherance of laundering the proceeds of the Loan Scheme.

(Title 18, United States Code, Sections 215(a)(2) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8. I am a Special Agent for the FBI and I have been personally involved in the investigation of this matter. I base this affidavit on that personal experience, as well as on my conversations with other law enforcement agents, and my examination of various reports and records. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview

9. As set forth more fully below, from at least in or about March 2019 up to and including in or about March 2020, HERODE CHANCY, who at all times relevant to this Complaint served as a bank manager at Bank-1, and ADEDAYO ILORI, the defendants, engaged in a scheme to submit fraudulent business loan applications, i.e., the Loan Scheme, to an individual they believed was employed as an underwriter by a third-party commercial lender but who was in reality an undercover law enforcement agent ("UC-1"). CHANCY and ILORI arranged to submit approximately eight fraudulent business loan applications by email and mail to UC-1 for a total of approximately $1,020,000 in loans. CHANCY and ILORI intended to "bust out" the loans, i.e., they intended not to repay the loans, and they then intended to close the business accounts that received the loans in order to prevent the commercial lender from recouping the loan payments.

10. To apply for the business loans, HERODE CHANCY and ADEDAYO ILORI, the defendants, submitted to UC-1 fabricated bank statements for purported business bank accounts. For some of the business loan applications, CHANCY and ILORI also used the identities of other persons as the purported loan recipients on the fraudulent loan applications, and opened bank accounts using the identification information of those other persons in

4

order to receive the loan proceeds.

   11. MICHAEL ALBARELLA, the defendant, who as described above, served as a manager at Bank-1 at all times relevant to this Complaint, opened a bank account using a stolen identity in order for HERODE CHANCY and ADEDAYO ILORI, the defendants, to launder proceeds of the Loan Scheme through the account, and ALBARELLA accepted an approximately $10,000 bribe in exchange for opening the account.

<u>Initial Meetings in Furtherance of the Loan Scheme</u>

   12. Based on my review of documents, my conversations with law enforcement officers, my conversations with a confidential source (the "CS")[1] and UC-1, my review of recorded conversations, as well as my own personal involvement in this investigation, I have learned, in part and in substance, that:

   a. On or about April 10, 2019, the CS met with HERODE CHANCY and ADEDAYO ILORI, the defendants, in Brooklyn, New York. The meeting was audio recorded. During the meeting, CHANCY and ILORI discussed fraudulently obtaining business loans from third parties through the CS. ILORI, in sum and substance, stated that he could make fake documents and obtain the identifications of other persons for use in this fraudulent loan scheme. CHANCY, ILORI, and the CS discussed, in sum and substance, that CHANCY and ILORI would obtain identification information for individuals in order to create fake identification documents, which CHANCY and ILORI would then use, along with fraudulently altered bank statements, to apply for the business loans. CHANCY explained, in sum and substance, that he had a contact who could alter bank statements. CHANCY, ILORI, and the CS also discussed, in substance and in part, that CHANCY and ILORI would open bank accounts using the identities of other persons in order to receive the loan payments.

   b. On or about July 2, 2019, the CS and UC-1 met with CHANCY in Manhattan. The meeting was audio recorded. During the meeting, CHANCY, in sum and substance, agreed to apply initially for approximately two business loans of approximately

---

[1] The CS has been a paid informed for the FBI since approximately February 2019. The CS has previously been convicted of narcotics and firearms offenses and racketeering charges, including murder and kidnapping in aid of racketeering. The information provided by the CS has been deemed reliable and corroborated by other information.

5

$10,000 each through the CS and UC-1 by submitting false bank statements and false identification documents to UC-1. CHANCY, in substance and in part, informed the CS and UC-1, that ILORI had previously opened business bank accounts at approximately three different banks using stolen identities, namely driver's licenses with real identifying information but an altered photograph, and that those business bank accounts were available to be used to receive the loan proceeds to conduct the Loan Scheme.

   c. Between in on or about July and October 2019, the CS and CHANCY continued to discuss, in sum and substance, the Loan Scheme, in audio recorded in person meetings and over the phone.

   d. On or about November 12, 2019, the CS met with CHANCY and ILORI in Manhattan. The meeting was audio recorded. The CS, CHANCY, and ILORI discussed, in substance and in part, that CHANCY and ILORI would initially submit fraudulent business loan applications for two loans of $10,000 each and later fraudulently apply for a larger loan, and they discussed that CHANCY would provide doctored bank statements and false identification documents to apply for the business loans and that ILORI would create the false identification documents. In addition, the CS, CHANCY, and ILORI discussed, in substance and in part, how to divide the loan proceeds amongst themselves and UC-1.

   e. On or about November 19, 2019, the CS and UC-1 met with CHANCY and ILORI in Manhattan. The meeting was audio recorded. During the meeting, the CS, UC-1, CHANCY, and ILORI discussed, in sum and substance, the Loan Scheme, including the fraudulent documents they would submit to apply for the loans, the number of loans they would obtain, and the timing of the scheme. During the conversation, ILORI explained, in sum and substance, that the identification documents to be used in furtherance of the scheme were out-of-state issued driver's licenses that were fraudulently obtained using stolen identities.

<u>The Initial Fraudulent Loan Applications Submitted for $20,000 in Loans in Furtherance of the Loan Scheme</u>

   13.   Based on my review of documents and law enforcement databases, my conversations with law enforcement officers, my conversations with the CS and UC-1, my review of recorded conversations, as well as my own personal involvement in this investigation, I have learned, in part and in substance, that:

a. On or about December 13, 2019, HERODE CHANCY, the defendant, emailed a loan application ("Loan Application-1") in the name of another person and fraudulently doctored bank statements (the "Loan Application-1 Bank Statements") to UC-1 with the expectation that UC-1 would submit Loan Application-1 and the Loan Application-1 Bank Statements to the third-party lender. A review of law enforcement databases shows that the identity listed on Loan Application-1 is a real identity of an individual. The Loan Application-1 Bank Statements were real bank statements, but the account number ("Account Number-1") and the business account holder ("Business Account Holder-1") had been changed. Several of the pages of the Loan Application-1 Bank Statements included a different account number ("Account Number-2") that appears to have been unintentionally left on the otherwise falsified statement sent by CHANCY to UC-1. Based on grand jury subpoena returns for Bank Account Number-2, I have learned that the Loan Application-1 Bank Statements were the actual statements for a business ("Business Account Holder-2") that used Account Number-2, and that the account number and account holder on the Loan Application-1 Bank Statements had been changed to Account Number-1 and Business Account Holder-1 in order to disguise the source of the Loan Application-1 Bank Statements.

b. Between on or about January 13 and 15, 2020, the CS and ADEDAYO ILORI, the defendant, had phone calls, which were consensually recorded, in which they discussed the Loan Scheme, including, in sum and substance, the fraudulent driver's licenses and fraudulent bank statements that ILORI was preparing, and that ILORI was preparing them with the assistance of another unidentified individual.

c. On or about January 16, 2020, law enforcement officers recovered from an undercover mailbox located in New York, New York, four fraudulent loan applications that CHANCY had mailed to UC-1. Loan Application-1 was one of those four loan applications. A review of law enforcement databases shows that the three identities listed on each of the three other loan applications ("Loan Applications-2, -3, and -4," respectively) are real identities of other persons. In addition, a review of bank records obtained pursuant to grand jury subpoenas shows that the bank statements submitted with Loan Applications-2, -3, and -4 were altered prior to CHANCY mailing those statements. For example, the transaction history listed on the bank statements accompanying Loan Applications-2, -3, and -4 does not match the transaction history reflected in the bank records obtained from the banks pursuant to grand jury subpoenas for the bank account

numbers listed on the bank statements for Loan Applications-2, -3, and -4.

   d. On or about January 16, 2020, UC-1 spoke with CHANCY on a recorded call, and they discussed, in substance and in part, that the bank statements submitted with Loan Application-1, -2, -3, and -4, were doctored.

   e. On or about January 19 and January 23, 2020, CHANCY emailed to UC-1 four term sheets that confirmed a loan amount of $5,000 for each of Loan Application-1, -2, -3, and -4. The term sheets were purportedly signed in the name of the loan applicants.

   f. On or about January 23, 2020, four $5,000 wire transfers were sent from an undercover bank account to the four bank accounts listed on Loan Applications-1, -2, -3, and -4 submitted by CHANCY to UC-1. The bank accounts were opened in the name of the identities listed on Loan Applications-1, -2, -3, and -4. CHANCY informed the CS in later recorded conversations, in substance and in part, that CHANCY and ILORI had withdrawn the funds from the four accounts.

   g. On or about January 30, 2020, the CS met CHANCY at the Bank-1 branch office where CHANCY worked in Manhattan (the "Bank-1 Branch Office"). The meeting was audio recorded. During the meeting, CHANCY paid the CS $3,000 in U.S. Currency, which was part of the commission CHANCY and ILORI owed to the CS and UC-1 for their role in the Loan Scheme in accordance with their prior agreement.

<u>The Later Fraudulent Loan Applications Submitted for $1,000,000 in Loans in Furtherance of the Loan Scheme</u>

   14. Based on my review of documents, my conversations with law enforcement officers, my conversations with the CS and UC-1, my review of recorded conversations, as well as my own personal involvement in this investigation, I have learned, in part and in substance, that:

   a. On or about February 18, 2020, the CS met HERODE CHANCY, the defendant, at the Bank-1 Branch Office. The meeting was audio recorded. During the meeting, CHANCY paid the CS an additional $2,000 in U.S. Currency as commission to the CS and UC-1 for their role in securing the $20,000 in fraudulent loan proceeds distributed to date for the Loan Scheme. During this meeting, CHANCY and the CS discussed the next four larger loan

applications that CHANCY intended to submit to UC-1, for $250,000 per loan. CHANCY told the CS, in substance and in part, that he had printed the fraudulent bank statements for the larger loan applications at a FedEx store because he had not wanted to print them at work. CHANCY showed the CS the fraudulent bank statements. During the meeting, MICHAEL ALBARELLA, the defendant, entered the room, and CHANCY did not attempt to hide the fraudulent bank statements. At that point, the CS met with ALBARELLA in a separate room at the Bank-1 Branch Office, and the meeting was audio recorded. ALBARELLA told the CS, in substance and in part, that he could open two to three personal bank accounts for the CS at Bank-1 using the identities of other persons so long as the race of the individual on the identification card used to open the bank account matched the race of the individual who entered Bank-1 to open the account.

    b. On or about February 19, 2020, CHANCY emailed four additional fraudulent loan applications to UC-1 and mailed the same to UC-1 at the same undercover mailbox in Manhattan. CHANCY had also previously discussed with the CS and UC-1 in recorded conversations that each of these loans would be for $250,000 and that CHANCY and his co-conspirators were not intending to repay the loans, i.e., they intended to "bust out" the loans. Three of these four larger loan applications used the same identities as Loan Applications-1, -2, -3, and -4 ("Loan Applications-5, -6, and -7," respectively). The fourth of the larger loan applications listed CHANCY as the loan applicant ("Loan Application-8"). A review of bank records obtained pursuant to grand jury subpoenas shows that the bank statements submitted with Loan Applications-5, -6, and -7 are fraudulent because the transaction history on the bank statements for Loan Applications-5, -6, and -7 does not match the actual transaction history of those bank accounts as reflected in records produced by the banks in response to grand jury subpoenas, i.e., the transaction history on the bank statements for Loan Applications-5, -6, and -7 is fabricated.

    c. On or about February 20, 2020, UC-1 and CHANCY spoke on a recorded call regarding the Loan Scheme. During the call, CHANCY asked UC-1, in substance and in part, whether the lender for which UC-1 worked and that was issuing the loans for Loan Application-5, -6, -7, and -8 would seek to impose a judgment on the loan applicants for failing to repay the loans. CHANCY explained, in substance and in part, that the bank accounts used to receive the loan payments would be closed after the loans are busted out in order to prevent the collection of any judgments by the lender. CHANCY expressed concern that the lender would seek

to impose a personal judgment against CHANCY because CHANCY was using his own identity to apply for one of the loans. CHANCY also explained, in substance and in part, that three of the four loan applicants for the larger loans were "legit," *i.e.*, that three of the four loan applicants, including CHANCY, were using their own identities to participate in the Loan Scheme, and the fourth identity was a stolen identity. During the conversation, CHANCY asked UC-1 if UC-1 was speaking on a "burner phone," which UC-1 confirmed. In addition, CHANCY admitted to UC-1 that he had previously thought UC-1 was a "cop," and CHANCY and UC-1 joked about CHANCY's prior concerns that UC-1 worked for law enforcement.

    d. On or about February 24, 2020, CHANCY emailed to UC-1 four term sheets that confirmed loan amounts of $250,000 for each of the four larger loan applications, for a total of $1,000,000 in loans for Loan Applications-5, -6, -7, and -8. The term sheets were signed in the name of the loan applicants.

### The Conspiracy to Launder the $1,000,000 in Fraudulent Loan Proceeds

    15. Based on my review of documents, my conversations with law enforcement officers, my conversations with the CS, UC-1, and a second undercover officer ("UC-2"), my review of recorded conversations, as well as my own personal involvement in this investigation, I have learned, in part and in substance, that:

    a. On or about February 26, 2020, the CS met with HERODE CHANCY, the defendant, at the Bank-1 Branch Office. The meeting was audio recorded. The CS explained to CHANCY, in substance and in part, that they needed to open a "clean" bank account—*i.e.*, an account not associated with anyone involved in the Loan Scheme—in order to launder the proceeds from the Loan Scheme obtained pursuant to Loan Applications-5, -6, -7, and -8. CHANCY called ADEDAYO ILORI, the defendant, in the CS's presence. During the call, CHANCY informed ILORI, in substance and in part, that the CS wanted to move the proceeds from the larger fraudulent loan applications using a bank account that was not associated with the CS. CHANCY asked ILORI, in substance and in part, if ILORI had a "random" identity they could use and whether they could open a bank account using the stolen identifications ILORI had previously given CHANCY. CHANCY asked ILORI, in substance and in part, to send him the identification on his other phone. After the call to ILORI, CHANCY told the CS, in substance and in part, that he had an identification that the CS could use to open the bank account. CHANCY showed the CS a Missouri state identification on his

personal cellphone (the "Stolen Missouri ID").

    b. Later that same day, the CS met with MICHAEL ALBARELLA, the defendant, at the Bank-1 Branch Office. The meeting was audio recorded. During the meeting, ALBARELLA indicated, in substance and in part, that he was aware of the Loan Scheme, and the CS explained, in substance and in part, that the CS needed to open bank accounts to "clean" the fraudulent loan proceeds. The CS offered ALBARELLA $10,000 in U.S. Currency to open fraudulent bank accounts, with $5,000 to be paid up front to open the accounts and $5,000 to be paid after the accounts were funded with the fraudulent loan proceeds. ALBARELLA agreed to open the accounts in exchange for the $10,000 in U.S. Currency. In addition, ALBARELLA told the CS, in substance and in part, that he wanted to take part in the Loan Scheme in the future by submitting fraudulent loan applications and that he could have doctored bank statements prepared for the loan applications. ALBARELLA informed the CS, in substance and in part, that the CS could open the bank accounts any day that ALBARELLA was working and that the race of individual who opened the bank accounts should match the race of the individual on the identification card provided to Bank-1 to open the bank accounts. CHANCY subsequently joined the meeting with the CS and ALBARELLA. In response to questions from CHANCY, ALBARELLA informed CHANCY and the CS, in substance and in part, that a date of birth and social security number would be required to open the laundering bank account but that the person who came into the bank to open the bank account did not need to look like the person pictured on the identification used to open the bank account. CHANCY showed the Stolen Missouri ID on his cellphone to the CS and ALBARELLA and asked ALBARELLA, in substance, if the identification could be used to open a bank account. ALBARELLA responded yes.

    c. On or about February 27, 2020, the CS and UC-2 met with CHANCY at the Bank-1 Branch Office. UC-2 was introduced to CHANCY as a friend of the CS who was willing to open a personal bank account using the Stolen Missouri ID. The meeting was audio and video recorded. CHANCY gave UC-2 a photocopy of the Stolen Missouri ID in order to open a bank account to launder the proceeds of the Loan Scheme. ALBARELLA introduced himself to UC-2 and went to a separate office with UC-2, where ALBARELLA opened a bank account for UC-2 using the Stolen Missouri Stolen ID. UC-2 was not the individual listed or pictured on the Missouri Stolen ID. ALBARELLA brought UC-2 to a bank teller, who assisted UC-2 with making a deposit into the newly opened account. UC-2 subsequently told ALBARELLA, in

11

substance and in part, that he had the $5,000 payment for ALBARELLA for opening the bank account. ALBARELLA took UC-2 into a bathroom at the Bank-1 Branch Office, where UC-2 paid ALBARELLA $5,000 in U.S. Currency. ALBARELLA explained, in substance, that they were conducting the transaction in a bathroom because there were no cameras in the bathroom.

        d. A review of law enforcement databases shows that the Stolen Missouri ID reflects the identity of a real person.

    WHEREFORE the deponent respectfully requests that warrants be issued for the arrest of HERODE CHANCY, MICHAEL ALBARELLA, and ADEDAYO ILORI, the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

                                            _____
                                            Terry B. Kim
                                            Special Agent
                                            FBI

Sworn to before me this
__3__ day of March, 2020

_____
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK